UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Intellitech Corporation,
 Plaintiff

  v.         Case No. 16-cv-0009-SM
            Opinion No. 2018 DNH 109
The Institute of Electrical and
Electronics Engineers, Inc.
a/k/a IEEE,
 Defendant

## O R D E R

In this suit for copyright infringement, plaintiff, Intellitech Corporation, alleges that defendant, The Institute of Electrical and Electric Engineers ("IEEE"), infringed what it claims to be its original, registered, work, entitled "Clause for a Pipeline v. 20." Intellitech seeks injunctive relief, statutory damages, attorneys' fees, and costs. Plaintiff moves for summary judgment with respect to liability. Defendant, for its part, seeks partial summary judgment on plaintiff's requests for statutory damages, attorneys' fees and injunctive relief. For the reasons given below, both motions for summary judgment are necessarily denied.

## STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the

nonmoving party's favor."  Block Island Fishing, Inc. v. Rogers,
844 F.3d 358, 360 (1st Cir. 2016) (citation omitted).  Summary
judgment is appropriate when the record reveals "no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).

In this context, a factual dispute "is 'genuine' if the
evidence of record permits a rational factfinder to resolve it
in favor of either party, and 'material' if its existence or
nonexistence has the potential to change the outcome of the
suit."  Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016)
(citation omitted).  Consequently, "[a]s to issues on which the
party opposing summary judgment would bear the burden of proof
at trial, that party may not simply rely on the absence of
evidence but, rather, must point to definite and competent
evidence showing the existence of a genuine issue of material
fact."  Perez v. Lorraine Enters., 769 F.3d 23, 29–30 (1st Cir.
2014).  In other words, if the nonmoving party's "evidence is
merely colorable, or is not significantly probative," no genuine
dispute as to a material fact has been proved, and summary
judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 249-50 (1986) (citations omitted).

So, to defeat a properly supported motion for summary
judgment, the non-movant must support his or her factual claims

with evidence that conflicts with that proffered by the moving party.  See generally Fed. R. Civ. P. 56(c).  It naturally follows that while a reviewing court must take into account all properly documented facts, it may ignore a party's bald assertions, speculation, and unsupported conclusions.  See Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997).  See also Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## BACKGROUND

The IEEE is a not-for-profit corporation that, with the involvement and assistance of employees and expert volunteers, develops and publishes technical standards applicable in a wide range of electrical and electronic endeavors.  Those standards are typically developed by "working groups" comprised of industry participants collaborating together.  Once finalized, the standards are published by IEEE, and made available to IEEE members, as well as members of the general public.

To develop general technical standards, working group members participate in meetings, typically held weekly or biweekly, draft and review position pieces, and create and

review presentations.  Bennett Declaration (Document No. 13-4) ¶ 4; Clark Declaration (Document No. 23-1) at ¶ 4.  Meetings are usually conducted telephonically or remotely via Webex or other remote conferencing software.  Bennett Declaration at ¶ 4.  Each working group has its own password protected website for use, called a "grouper" site.  Id. at ¶ 6.  The grouper site acts as a repository for the group's working materials, including drafts or other materials group members may want to review or consider. Group members routinely upload drafts, proposed language, and presentations to the grouper site for review and comment.  Id. at ¶ 8.  Minutes from group meetings are also stored on the grouper site.  Id. at ¶ 6.

IEEE's copyright policy governing the standards development process (the "Policy") is fairly straightforward.[1]  It requires

---

[1]    Intellitech argues that the IEEE-SA's Policy is not relevant here because "the actual copyright rules of the parent corporation which is the Defendant in this case [IEEE, Inc.]" do not reference implied licenses.  Pl.'s Reply in Supp. of Mot. for Summary Judgment at 8.  Intellitech says that IEEE is relying upon the rules of a "different, perhaps related, entity, IEEE-SA," and has not established that IEEE-SA's rules are applicable here.  Id.  Intellitech points to IEEE, Inc.'s "Section 6 – Published Products and Services" policy, and seemingly takes the position that Section 6 applies to the P1838 standards development process.

Intellitech's argument is inconsistent with the position taken by its CEO, Christopher J. Clark, in his September 2, 2014, letter to IEEE counsel, in which he relies upon Section 7.1 of the IEEE-SA bylaws in support of his position.  See Document No. 23-4, p. 2.  Intellitech makes no effort to explain

that "[a]ll contributions to IEEE standards development . . .

meet the requirements outlined in this clause." Document No.

13-5 (emphasis added). Two definitions in the Policy are

relevant to the parties' dispute. The first defines

"published," as:

> [M]aterial for which a claim of copyright is apparent
> (e.g., the presence of the copyright symbol ©; an
> explicit statement of copyright ownership or
> intellectual property rights; stated permission to use
> text; a text reference that indicates the insertion of
> text excerpted from a copyrighted work; or a visual
> indication of an excerpt from another work, such as
> indented text).

Id. The second term, "work product," is defined as: "the

compilation of or collective work of all participants (e.g., a

---

why IEEE-SA's policies were applicable to the mechanisms of the
P1838 working group as of September 2, 2014, but are now
inapplicable. Intellitech also seemingly relies upon IEEE-SA's
bylaws and practices in its motion for summary judgment,
referencing the copyright policy in support of its position.
See Pl.'s Mem. in Supp. of Mot. for Summary Judgment at n.2.

Moreover, the evidence in the record does not support
Intellitech's position. As defendant points out, Kathryn
Bennett, IEEE's Senior Program Manager with administrative
oversight for the P1838 working group, explained in her
Declaration that IEEE-SA's copyright policies applied to and
governed the work of the P1838 working group. See Bennett
Declaration at ¶ 8. And, the Policy itself clearly states: "All
contributions to IEEE standards development . . . shall meet the
requirements outlined in this clause." Document No. 13-5. The
parties' suit arose out of the IEEE standards development
process. Intellitech fails to point to any competent evidence
to the contrary.

For all those reasons, Intellitech's argument is not
persuasive.

draft standard; the final approved standard; draft Industry Connections white paper; Industry Connections web site)." Id.

In relevant part, the Policy states:

**7.2 Policy**

The IEEE owns the copyright in all Work Products.

Participants are solely responsible for determining whether disclosure of any contributions that they submit to the IEEE requires the prior consent of other parties and, if so, to obtain it.

**7.2.1 Contributions from previously Published sources**

All contributions from previous Published sources that are not Public Domain shall be accompanied by a Copyright Permission Form that is completed by the copyright owner, or by a person with the authority or right to grant copyright permission. The Copyright Permission Form shall outline the specific material being used and the planned context for its usage in the Work Product.

**7.2.2 Contributions not previously Published**

For any contribution that has not been previously Published, and that is not Public Domain:

a) The IEEE has the non-exclusive, irrevocable, royalty-free, worldwide rights (i.e., a license) to use the contribution in connection with the development of the Work Product for which the contribution was made.

…

Copyright ownership of the original contribution is not transferred or assigned to the IEEE.

Id. (all emphasis in original).

The events giving rise to this dispute arose out of IEEE's
efforts to develop a technical standard for "Test Access
Architecture for Three-Dimensional Stacked Integrated Circuits."
The P1838 working group, tasked with the development of the
standard, was divided into three subgroups called "Tiger Teams."
Each Tiger Team was assigned responsibility for various aspects
of the overall standard, and the teams worked separately on
concepts and proposed language for their assigned areas.
Breitfelder Declaration (Document No. 57-3) at ¶ 3.
Intellitech's CEO, Christopher J. Clark, was a member of Tiger
Team 1.  Clark has a long history with IEEE, having volunteered
with the organization for over 24 years, chairing three
different working groups during that time.

The parties disagree about the role Clark played on Tiger
Team 1.  Clark argues that, while participating in the working
group, he developed Intellitech's "position piece" on how serial
access and pipeline registers should be managed by a 3D standard
"[e]ntirely on his own," and retained and exercised exclusive
control over the document he created.  Pl.'s Mem. in Supp. of
Mot. for Summary Judgment at 4; Clark Declaration (Document No.
60-2) at ¶¶ 13-16.  Clark says he distributed multiple versions
of the document to his team members, but always in uneditable
electronic form, bearing an Intellitech "watermark."  Clark

Declaration (Document No. 23-1) at ¶ 7.  And, Clark says that,
as the working group discussed his document, he refined it,
presenting and explaining the rationale for Intellitech's
position as it evolved.  Clark Declaration (Docket No. 23-1) at
¶ 7.  Clark contends he "named the Intellitech position piece,
in its final form, 'Clause for a Pipeline v. 20'" (hereinafter,
the "Clause").  Pl.'s Mem. in Supp. of Mot. for Summary Judgment
at 5.

   The defendant, however, characterizes Clark's role quite
differently — as the Tiger Team 1 "designated 'scribe.'"[2]  Def.'s
Mem. in Opp. to Summary Judgment at 4.  Defendant draws a
distinction between PowerPoint slide presentations Clark made to
the team ("position pieces") and the team's collaborative
development of the Clause, which, defendant says, "contained
language proposed and formatted for the purpose of comprising,
or being included in, the draft P1838 standard[,] and which
reflected the consensus of the team."  Id. at 4-5.  Defendant
takes the position that Clark was developing, compiling, and
presenting language for the team to consider and eventually
incorporate into the draft standard.  The proposed Clause, as

---

[2]    Clark strenuously disagrees that he was a mere "scribe,"
but he seemingly misunderstands the term given the context in
which it was used.  See Clark Declaration (Document No. 60-2),
¶ 17.

evolved, represented the "consensus and collective judgment of the team as to how to express the ideas they were jointly developing." Id. at 12.

In any event, on April 10, 2014, Clark circulated an early version of the Clause to the Tiger Team. He wrote: "[h]ere is the foundational clause needed to describe pipeline bits. I have come up with 'short names' for the paths that everyone had selected last week. I use those path names to create a set of rules and recommendations." Document No. 57-2, at p. 1.

Prior to the Tiger Team meeting on May 8, 2014, Clark circulated another version of the Clause, writing: "I'm attaching a proposed clause, subject to [working group] changes, on the pipeline register." Document No. 57-2, at p. 6. And, at the Tiger Team meeting on May 8, 2014, Clark told the team that he had "developed a clause for the pipeline." Document No. 13-6, at p. 16. In the context of the team's discussion of the document, team member Eric Jan Marinissen commented, "It looks like it's in the IEEE template." Id., at p. 17. Clark responded, "It's exactly that. . . Written to be able to get in to the standard." Id.

On May 13, 2014, Clark circulated yet another version of the Clause prior to the team's next meeting. Document No. 66-6,

at p. 1.  He wrote: "Here is the latest document which hopefully reflects the position of the majority of TT1 members."  <u>Id</u>.  The team continued to discuss the latest version of the Clause at the next meeting (May 15, 2014).  <u>See</u> Document No. 13-6, at p. 19.  That process continued over the next several months, with Clark circulating evolving versions of the Clause to the team, and the team discussing the document at their meetings. <u>See</u>, <u>e.g.</u>, Document No. 57-2, at p. 12 (Clark circulating version reflecting revisions "as discussed," and requesting that team members "tweak it and make it ready for a vote as a whole clause in the coming weeks"); Document No. 13-6, at p. 20-28 (May 29, 2014, and June 5, 2014, team meeting minutes); Document No. 57-2, at p. 20 (June 12, 2014, email from Clark, circulating "most recent version" of Clause); Document No. 13-6, at p. 29 (June 12, 2014, team meeting minutes, including agenda item: "Review CJ's clause-for-pipeline-v7.pdf").

At a Tiger Team 1 meeting held on July 10, 2014, Marinissen raised concerns about the Intellitech watermark Clark had included on all versions of the Clause he presented and circulated.  Document No. 13-6, p. 33.  Marinissen asked Clark to either remove the watermark, or change the mark to P1838. Clark noted that, until the team "vote[d] on something for P1838 and [made] it part of the standard, he consider[ed] [the Clause]

Intellitech's[, and] would rather keep the Intellitech

watermark." Id.  The discussion continued:

> [Clark] doesn't want people to copy it and call it
> their own.  It was then pointed out that this is a
> group effort and some of the ideas in the slides are
> from others in the working groups. . . .  [S]ome of
> the information that gets added to this document is
> from the working group discussion and it is not
> appropriate to have the [I]ntellitech watermark.
> [Clark] said he would like to continue the way he is
> doing it at the moment.

Document No. 13-6, p. 33.


Clark responded further to Marinissen's concerns regarding

Intellitech's watermark in an email dated July 17, 2014.

Document No. 23-4, p. 123.  Clark wrote:

> I went back and reviewed v1 to v14 [of the Clause,]
> and I could not identify a figure or text which could
> stand-alone be copyrightable to another [working
> group] member, hence I could not see whether joint
> authorship existed.  The words and figures, I
> authored, even if it was in response to me asking
> questions as to 'what is it you want?' to [working
> group] members. . . .  I am not the editor nor am I
> creating or working with the P1838 draft which is
> copyright IEEE.  You can see a distinct difference
> between what I supply to the P1149.10 [working group]
> which is the P1149.10 draft with a copyright
> attributed to the IEEE[,] and the attached document
> which is in 'Clause' form with rules, recommendations.
> Figures in P1149 which are authored by Intellitech
> were donated to the [working group] to use in the
> draft.  That is the correct terminology[:] "donated."
>                         …
>
> I would say the discussion is 'much ado about nothing'
> as I had already said I would donate the material to
> the IEEE should we accept this inclusion with the
> draft.  All in all we should be creating an air of
> encouragement and thanks when members are contributing

> numerous hours to creation of content for the
> standard.  It's an entirely different effort than
> attending meetings.

Document No. 23-4, p. 123.  In that same email, Clark wrote that
he had not made any changes to the current version of the Clause
"since last week," and, "[f]or homework due next week," the team
should "review the clause lines 1-121 and send feedback to the
group of suggested changes, otherwise I would entertain a motion
next week to accept the clause as written."  Id.

On July 24, 2014, Clark circulated version 16 of the
Clause.  He wrote: "This is the proposed clause for pipeline and
registration cells.  Version 16 captures the changes . . . from
our last meeting. . . .  I suspect that we are close to wrapping
up in a week or two.  The proposal captures all the input
supplied from various members (i.e.[,] we worked towards
minority inclusion rather than minority exclusion."  Document
No. 57-2, p. 28.

The team continued to meet, and, at its July 31, 2014,
meeting, seemed close to finalizing the document for insertion
into the main draft standard.  Document No. 66-10, pp. 1-2.
Clark noted at the start of the meeting that he had circulated a
version of the Clause the night prior (version 17), and the team
reviewed that version together.  Clark discussed changes he made

to the document based on team member's comments, and solicited feedback on revisions. Id., p. 1. Clark then asked the team:

> If we were to put [the Clause] up for a vote [to present to the main P1838 group,] what would be the additional changes we'd like to see that would convert a no vote to a yes vote . . . I would prefer to have a unanimous vote and then bring it to the main group. . . . This is a major milestone. This would be the first main clause to be inserted in to the main draft and I want it to be unanimous. According to IEEE[,] you should incorporate comments from the minority.

Id., p. 2.

On August 7, 2014, Clark emailed the Clause, version 20, to team members, "with changes from today." Document No. 62-2, p. 2. He wrote: "Group wanted to remove ambiguity with using hex and decimal for capture and reset values such that each value is explicitly defined (no ambiguous padding). Other feedback on recommendation and grammar was incorporated in the meeting." Id. Clark asked team members to review and provide feedback prior to the next team meeting. On August 14, 2014, Marinissen emailed Clark, requesting a Microsoft Word version of the Clause so he could make his "suggested edits directly" in the document with "Track Changes." Document No. 23-4, p. 126. After Clark provided Marinissen with a Word version, Marinissen emailed the team the Clause with his proposed revisions, including replacement of the Intellitech watermark with a P1838 watermark. See Document No. 23-4, p. 128.

According to Clark, he "objected immediately to . . . Marinissen's pirating of [his] work and . . . halted [Tiger Team 1] meetings until we could resolve the issue." Clark Declaration (Document No. 23-1) at ¶ 10. Then, on September, 2, 2014, Clark wrote to Eileen Lach, IEEE's General Counsel and Chief Compliance Officer, articulating the position that Intellitech was the author and copyright owner of the Clause, and complaining that Marinissen "conducted willful infringement; he was advised who the copyright holder was, had an opportunity not to infringe, sought out the original document under false pretenses and claimed the copyrighted work for his own working group's use." Document No. 23-4, pp. 2-3. Clark requested that IEEE order Marinissen to issue a written apology to Intellitech, and to promise "not to misappropriate any participant's material." Id., p. 3.

The team attempted to resume meeting on September 11, 2014, but Kathryn Bennett, IEEE's Senior Program Manager with administrative oversight for the P1838 working group, emailed team members that meetings would cease until the copyright issue was resolved by IEEE. Document No. 14-12, at p. 1. Intellitech and IEEE engaged in additional correspondence, with Intellitech sending IEEE a "take-down notice," or a cease and desist letter "asserting [Intellitech's] copyright ownership and IEEE's

infringement."[3]  Clark Declaration, Document No. 23-1, at ¶ 12;

see also Document No. 60-13, p. 2 (October 10, 2014 email from

Clark stating, "Please be advised that [IEEE] was sent a take-

down notice previously with today, 10/10/2014 as the expiration.

Should no action be taken[,] we will be forced to assume that

the IEEE will not comply.").  On October 10, 2014, IEEE

responded:

> While IEEE strongly disagrees with your assertions of
> impropriety and copyright infringement, of which IEEE
> believes none to have occurred, as a sign of good
> faith, and with respect to all rights and contentions
> of IEEE, pending resolution of our investigation of
> the matter, please be advised that we have removed the
> files you identified from our servers.

Document No. 60-13, p. 2.  By letter dated November 17, 2014,

IEEE further stated: "there is no present plan to incorporate

Clause for Pipeline v20 into the IEEE Std 1838 standard and any

precursory drafts thereof."  Document No. 14-5, p. 3.  Clark

---

[3]     In recent court filings, Clark takes the position:

[T]he copyright issues being discussed by me with
P1838 members involved [an] issue of copyright
ownership, not copyright infringement.  I simply was
educating Marinissen and making the required ownership
statement.  I did, and do certainly still today,
consider Mr. Marinissen's conduct in creation of a
derivative work on or after August 14, 2014[,] to have
been improper, as well as directly contrary to IEEE
ethics rules.

Clark Declaration (Document No. 62-1), at ¶ 4.  He further
states: "I never asserted that the IEEE infringed on any of
Intellitech's copyright rights."  Id.

"verified personally that . . . all copies of [plaintiff's work] were removed from the IEEE servers," and "Intellitech was satisfied with IEEE's response." Clark Declaration (Document No. 23-1) at ¶ 12.

On October 23, 2014, "Clause for a Pipeline v. 20" was registered with the United States Copyright Office Registration No. TXu 1-911-804. And, evidence in the record suggests that Tiger Team 1 was ultimately disbanded in late 2014.[4] See Bennett Declaration (Document No. 13-4) at ¶ 20.

In October, 2015, Marinissen filed an extension request with IEEE for P1838. See Document No. 14-9. In an effort to explain why an extension was necessary, Marinissen wrote:

> The copyright issue that was encountered in [Tiger Team] 1 was rather specific. The chair of [Tiger Team] 1 claimed copyright to a section of the draft standard that was developed within the subgroup. IEEE-SA does not agree with that copyright claim, which led to a conflict with the chair of [Tiger Team] 1. The Working Group disband[ed] [Tiger Team] 1 and suspended activities on this topic for one year. The Working Group is in the process of starting up a [Tiger Team] 4 with the same technical charter as [Tiger Team] 1 had. [Tiger Team] 4 will produce a fresh write-up of the various standard clauses,

---

[4] The evidence in the record is somewhat unclear on that point, as certain documents suggest that the team continued to meet at least through February, 2015. See, e.g., Document No. 14-13 (emails between, inter alia, Marinissen and Clark regarding February, 2015, meeting minutes and copyright licenses).

> thereby avoiding further copyright claims from the
> same person.

Id., p. 4.

The extension was seemingly approved, and Tiger Team 4 commenced meeting. However, at the first Tiger Team 4 meeting, the team's chair, Adam Cron, presented a five-page document containing language from the Clause, asserting its copyright by IEEE. Cron circulated versions of the document, entitled "IEEE P1838/D1.01," to Tiger Team 4 members as meetings progressed from December, 2015, through March, 2016, creating, according to Intellitech, seven purported derivatives of the Clause.

As of June, 2016, however, Tiger Team 4 had adopted a "placeholder draft" of language proposed for inclusion in the P1838 standard, which was drafted "specifically to avoid any actual or apparent overlap in language with the 'Clause.'" Breitfelder Declaration (Document No. 57-3) at ¶ 5. Team 4 continued to amend and update the placeholder, which was ultimately incorporated into the draft P1838 standard. Id. at ¶¶ 6-8. Neither the "placeholder draft" nor the current draft of the P1838 standard contains any language from the Clause. Id. at ¶ 11. IEEE has stated that the "P1838 Working Group has no intention of using any language from the Clause . . . in any

further iterations of the proposed draft standard or in the
final standard itself." <u>Id</u>. at ¶ 12.

## DISCUSSION

**I.   Intellitech's Motion for Partial Summary Judgment
      (On Liability Only)**

Intellitech asserts that there are no genuine issues of
material fact regarding its copyright infringement claim, and,
as it has demonstrated both its valid ownership of the copyright
for "Clause for a Pipeline v. 20," and that defendant "copied,
used and modified" its "Clause for a Pipeline v. 20" when it
created seven purported derivatives of the Clause in December,
2015, through March, 2016, it is entitled to summary judgment on
its infringement claim.  Pl.'s Mem. in Supp. of Mot. for Summary
Judgment at 11.

Defendant offers two responses.  First, defendant contends
that, to the extent Intellitech does own the copyright in the
Clause,[5] IEEE had (and has) a non-exclusive, irrevocable and
perpetual license to use the Clause in connection with the P1838

---

[5]    There is evidence in this record sufficient to contradict
Intellitech's factual claim of copyright ownership, and perhaps
to establish a potential joint ownership in the work.  <u>See</u> 1
Nimmer on Copyright § 6.03 (citations omitted); <u>see</u> <u>generally</u>
<u>Herbert, M. D., J. D. v. United States</u>, 36 Fed. Cl. 299 (1996).
Again, material issues of fact preclude summary judgment in
favor of Intellitech.

working group's efforts to develop a new technical standard.

Second, defendant argues that its use of the Clause was

protected by copyright law, because the Clause was used only to

give new expression to the working group's ideas, and the final

version of the P1838 standard will not contain language from the

Clause.

## A. __Implied License__

"To establish copyright infringement under the Copyright

Act, 'two elements must be proven: (1) ownership of a valid

copyright; and (2) copying of constituent elements of the work

that are original.'" Johnson v. Gordon, 409 F.3d 12, 17 (1st

Cir. 2005) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,

499 U.S. 340, 361 (1991)). "The plaintiff bears the burden of

proof as to both elements." Id. (citations omitted). However,

where a copyright owner grants a nonexclusive license to another

party, "[u]ses of the copyrighted work that stay within the

scope of a nonexclusive license are immunized from infringement

suits." John G. Danielson, Inc. v. Winchester-Conant Props.,

Inc., 322 F.3d 26, 40 (1st Cir. 2003) (citing Graham v. James,

144 F.3d 229, 236 (2d Cir. 1998).

While transfers of copyright typically "must be made in

writing, 17 U.S.C. § 204(a)," that "requirement does not apply

to nonexclusive licenses where ownership of the copyright is not

transferred, see id. at § 101." John G. Danielson, Inc., 322 F.3d at 40. "A copyright owner may grant such nonexclusive licenses orally, or they may be implied from conduct which indicates the owner's intent to allow a licensee to use the work." Id. (citations omitted). "[I]mplied licenses are found only in narrow circumstances," and the burden of proving the existence of the license falls on the purported licensee, the party claiming its protection. Estate of Hevia v. Portrio Corp., 602 F.3d 34, 41 (1st Cir. 2010).

Our court of appeals has instructed that "[t]he touchstone for finding an implied license ... is intent." Estate of Hevia, 602 F.3d at 41. Therefore, the court should "ask whether 'the totality of the parties' conduct indicates an intent to grant such permission.'" Id. (quoting 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.03[A][7], at 10–42 (2000)). "The test most commonly used in determining if an implied license exists with respect to most kinds of works asks whether the licensee requested the work, whether the creator made and delivered that work, and whether the creator intended that the licensee would copy and make use of the work." Estate of Hevia, 602 F.3d at 41.

IEEE argues that the totality of the parties' conduct compels the conclusion that — to the extent Intellitech does own

an exclusive copyright in the Clause — Intellitech granted IEEE a nonexclusive license to use the language of the Clause for the purpose of developing and drafting a P1838 standard. Plaintiff, on the other hand, contends that IEEE has not sufficiently proved conduct that would support "either an express or implied-in-law license at any time." Pl.'s Reply in Supp. of Mot. for Summary Judgment at 8. Construing the evidence in the light most favorable to the defendant, and drawing all reasonable inferences in its favor, as the court must on a motion for summary judgment, a reasonable factfinder could easily conclude that under these circumstances the course of conduct between the parties necessarily gave rise to an implied license. While "intent" is more often a question of fact, some circumstances might admit no other rational conclusion then that an intent to convey a license was fully understood by all.

The three-part inquiry — whether the licensee requested the work, whether the creator made and delivered that work, and whether the creator intended that the licensee would make use of the work — while not a perfect fit here — still seems to support rather than belie such a conclusion.

IEEE "requested" the P1838 working group, of which Clark was a member, develop a P1838 standard. The group was an assembly of experts in the pertinent field, all volunteering

their time and expertise in a <u>collaborative</u> effort to develop
generally accepted technical standards to benefit the field and
those who are involved in it.  Clark, consistently with his
voluntary commitment to work on the standard, drafted and, as
expected, contributed his expertise in developing and presenting
the Clause for discussion and further collaborative development
by the working group.

The relationship between the parties also could well be
found to support the conclusion that Intellitech intended to,
and understood that it was granting a nonexclusive and
irrevocable license to IEEE.  On that point, <u>Estate of Hevia</u>,
602 F.3d at 42, while not exactly on all fours, is instructive.
<u>Hevia</u> involved two business partners who jointly participated in
several real estate ventures.  <u>Id</u>. at 38.  One partner ran the
business side of the enterprise, while the other took charge of
design, devising architectural concepts, and creating plans used
for the partners' development activities.  <u>Id</u>.  The parties'
dispute arose out a planned residential community owned by one
of the venture's companies (RG Development), for which the
designer developed architectural plans (the "Hevia plans").  The
designer died, however, before development of the community
commenced.  Following his death, heirs sold his shares and
interest to his partner.  The surviving partner became the sole

shareholder in all companies owned by the venture, including RG

Development.  RG Development sold the land earmarked for the

residential community to another entity, and granted that entity

permission to use the Hevia plans in their development.  The

designer's heirs objected, asserting ownership of the Hevia

plans.

The court of appeals summarized the evidence that the

designer had granted RG Development an implied nonexclusive

license to use the plans to develop the residential community as

"compelling." Id. at 41.  The court stated:

> The evidence makes it pellucid that the relationship
> among [the parties] had a single overarching goal: the
> development of Río Grande Village.  RG Development was
> owned one-half by RHA and one-half by FV.  Thus, both
> men stood to gain from the seamless completion and
> eventual success of the project.  To this end, each
> man made a valuable contribution: RHA contributed his
> architectural talents (which yielded the copyrighted
> work) and FV contributed his financial and managerial
> expertise (which made the numbers work).
>
> RHA's intentions about the granting of a license must
> be viewed against this entrepreneurial backdrop.
> Because the very essence of RHA's ongoing relationship
> with FV and RG Development was founded on the
> successful consummation of the project (which
> necessitated RG Development's use of the Hevia Plans),
> that relationship weighs in favor of finding an intent
> on RHA's part to grant a license to RG Development.

Id. at 42.  The court continued:

> RHA's overall course of conduct speaks directly and
> unequivocally to his intent that the Hevia Plans be
> used to develop Río Grande Village.  He created the
> plans for that very purpose; and, as far back as 2000,

> gave permission to an engineer . . . to incorporate
> them into [his] more elaborate blueprints for the
> project.  The inference is inescapable that RHA
> expected all along that [the engineer's] work product
> would serve as the basis for obtaining the permits
> needed to move forward with the proposed development.

Id.

In this case, Clark, an IEEE volunteer,[6] was not compelled

to participate in the P1838 working group; he chose to do so,

fully understanding the nature of the collaborative effort aimed

at developing an IEEE technical standard, and certainly must be

charged with knowledge of IEEE's policies, practices, and

procedures.  As in Hevia, the working group had one "single

overarching goal:" development of the IEEE P1838 standard.  Id.

at 42.  Indeed, "the very essence" of Clark's relationship with

IEEE "was founded on the successful consummation of the

project."  Id.  And, given Clark's extensive experience as an

IEEE volunteer, Clark was surely aware that language used in

IEEE's standards necessarily originates with its volunteers'

---

[6]    Intellitech claims that it, and not Clark, is the owner of
the work, and, therefore, defendant must prove conduct by
Intellitech (not Clark) that supports an implied license.

    An implied license is like an implied contract.  I.A.E.,
Inc. v. Shaver, 74 F.3d 768, 776 (7th Cir. 1996).  And,
generally, "a president of a corporation is the head of the
corporation subject to the control of the board of directors as
to matters out of the ordinary, but with power to bind the
corporation in regard to contracts involved in the everyday
business of the corporation."  Holman-O. D. Baker Co. v. Pre-
Design, 104 N.H. 116, 118 (1962) (citations omitted).

drafting contributions.  Finally, as in <u>Hevia</u>, where the court
noted that the plans at issue were specifically created by the
architect "to develop Rio Grande Village," Clark not only knew,
but explicitly acknowledged that his efforts were intended as
part of the creation of the <u>P1838 standard</u>.  <u>See</u> Document No.
13-6, p. 17 (Marinissen: "Excuse me CJ what is this document
you're showing?  It looks like it's in the IEEE template" . . .
Clark: "<u>It's exactly that . . . Written to be able to get in to
the standard</u>.") (emphasis added).

Clark, a long-standing volunteer with IEEE, was presumably
familiar with its policies, including its copyright policies.
Clark chose to (repeatedly) participate in the IEEE's standards
development process.  Accordingly, a reasonable factfinder could
well infer that Clark agreed to the terms of the Policy
governing contributions to IEEE standards development, and
willingly agreed to abide by its terms.  Whether Clark (if he
had an exclusive copyright in any draft version) granted IEEE an
implied license to use the Clause "in connection with the
development of" the P1838 standard, is, on this record a
question that appears to require factual findings to resolve —
and is by no means clear as a matter of law.

Defendant has not moved for summary judgment on liability,
so the record is probably not fully developed with respect to

that issue.  But the current factual record is plainly insufficient to support summary judgment on liability in favor of Intellitech, and, if anything, probably leans against it. Material facts relevant to "intent," and whether an implied irrevocable non-exclusive license to use Clark's drafting work is held by IEEE (rendering the infringement claims meritless), are in dispute and, absent additional development clarification, require a trial.  Intellitech has simply not shown that it is entitled to judgment as a matter of law on this factual record. Accordingly, its motion is necessarily DENIED.

**II.  IEEE's Motion for Summary Judgment (On Claims for Statutory Damages, Attorneys' Fees and Injunctive Relief)**

IEEE moves for summary judgment on Intellitech's claims for statutory damages and attorneys' fees, which, IEEE argues, are precluded by 17 U.S.C. § 412.  IEEE further argues that the court should grant summary judgment against Intellitech's claims for injunctive relief on mootness grounds.  Disputed material facts preclude the entry of summary judgment on both grounds.

### A.   17 U.S.C. § 412

Pursuant to Section 504, a copyright owner may elect to recover, in lieu of actual damages and profits, an award of statutory damages for all infringements involved in the action.

17 U.S.C. § 504.  Statutory damages and attorneys' fees, however
are not available for:

> (1)  any infringement of a copyright in an unpublished
>      work commenced before the effective date of its
>      registration; or
>
> (2)  any infringement of copyright commenced after
>      first publication of the work and before the
>      effective date of its registration, unless such
>      registration is made within three months after
>      the first publication of the work.

17 U.S.C. § 412.

In support of its motion, IEEE argues that plaintiff's
damages claim falls into the first category because any
purported infringement began, if at all, before Intellitech's
registration of the Clause.  IEEE argues that Intellitech first
claimed infringement of its copyright in August of 2014.  The
Clause was not registered until October of 2014.  And, IEEE
further contends, the Clause was "unpublished" prior to its
registration in October of 2014.  With respect to post-
registration infringement, occurring between December, 2015, and
March, 2016, IEEE argues that any purported infringement
occurring during that time period was merely a continuation of
the August, 2014, infringement, as there is no difference
between Intellitech's allegations of pre- and post-registration
infringement activity.

Finally, IEEE argues that, even if the Clause could be considered "published," Intellitech cannot recover statutory damages or attorneys' fees under the statute's second category. That is because Intellitech failed to register the Clause within three months of its first publication, on April 10, 2014 (when the Clause was first distributed to members of the Tiger Team on the shared P1838 website).

### (1) Affirmative Defense

Before reaching the merits of the defendant's motion, Intellitech's contention that 17 U.S.C. § 412 creates an affirmative defense, which defendant waived by failing to properly and timely plead, ought to be addressed. Intellitech likens 17 U.S.C. § 412 to a statutory bar (or cap) on damages, citing Jakobsen v. Mass. Port Authority, 520 F.2d 810, 813 (1st Cir. 1975), in which our court of appeals held that a statutory limitation on the Port Authority's liability should have been asserted as an affirmative defense.

Whether 17 U.S.C. § 412 is analogous to a "damages cap," and so should be treated as an affirmative defense, is not settled in the relevant case law. There are a few cases from the Central and Northern Districts of California that seem to support that view. See, e.g., Malem Med., Ltd. v. Theos Med. Sys., No. C-13-5236 EMC, 2014 WL 3568885, at *3 (N.D. Cal. July

18, 2014); <u>Peliculas y Videos Internacionales, S.A. de C.V. v.</u>
<u>Harriscope of L.A., Inc.</u>, 302 F. Supp. 2d 1131, 1138 (C.D. Cal.
2004).  But, other courts put the burden of proving satisfaction
of Section 412's requirements squarely on the plaintiff.  <u>See</u>,
<u>e.g.</u>, <u>Sullivan v. Flora, Inc.</u>, No. 15-CV-298-WMC, 2017 WL
3575630, at *2 (W.D. Wis. May 16, 2017) ("Plaintiff argues that
a challenge to statutory damages based on the timing of the
registration vis-à-vis the commencement of infringement had to
be pleaded as an affirmative defense. . . .  Given the lack of
support for this position from any other court, and in light of
the Seventh Circuit's limited treatment of statutory damages,
plaintiff appears to have the burden of proving that she
satisfies § 412's timing requirement before being entitled to
statutory damages.") (internal citations omitted).

For purposes of resolving this motion, the issue need not
be resolved.  Assuming <u>arguendo</u> that plaintiff is correct, and
defendant was required to raise 17 U.S.C. § 412 as an
affirmative defense, the defendant has adequately and timely
done so, in a manner sufficient to provide plaintiff with fair
notice of the issue.  <u>See InvestmentSignals, LLC v. Irrisoft,</u>
<u>Inc.</u>, No. 10-CV-600-SM, 2011 WL 3320525, at *2 (D.N.H. Aug. 1,
2011) (an affirmative defense "must merely provide fair notice
of the issue involved."); <u>see also Lexington Luminance LLC v.</u>

TCL Multimedia Tech. Holdings, Ltd., No. 16-CV-11458-DJC, 2017 WL 3795769, at *7 (D. Mass. Aug. 30, 2017) ("[T]he Court declines, at this stage, to strike affirmative defenses that are more than adequate to give [plaintiff] fair notice of Defendants' defenses."). IEEE pled in its Answer as an affirmative defense: "Intellitech has failed to state a claim for statutory damages or attorneys' fees." Ans. at ¶ 34. That is more than adequate to provide plaintiff with fair notice, especially given that defendant also filed a motion pursuant to Fed R. Civ. P. 12(b) to dismiss, arguing that Section 412 barred Intellitech's statutory damages claims.

(2) Continuing Conduct

Section 412 of the Copyright Act was designed to "implement two fundamental purposes:" to provide copyright owners with an incentive to promptly register their copyrights; and to encourage potential infringers to check the Copyright Office database. Derek Andrew, Inc. v. Poof Apparel Corp., 528 F.3d 696, 900 (9th Cir. 2008). Consistent with that purpose, Section 412 prohibits recovery of statutory damages and attorneys' fees for alleged infringement: (1) of an unpublished work that commences before the effective date of the copyright registration; or (2) of a published work that occurred after publication but before registration, unless registration is made

within three months of first publication.  See Latin Am. Music
Co. v. Am. Soc'y Of Composers (ASCAP), 642 F.3d 87, 90 (1st Cir.
2011) ("Section 412 bars recovery of statutory damages under
section 504 and attorneys' fees under section 505 by copyright
owners who failed to register the work before the alleged
infringement began.") (citing 17 U.S.C. § 412(2)) (additional
citations omitted).  Therefore, whether plaintiff is entitled to
statutory damages depends on whether defendant's purported
infringement began prior to plaintiff's registration of the
Clause in October, 2014.

     "Every court to consider the issue has held that
'infringement "commences" for the purposes of § 412 when the
first act in a series of acts constituting continuing
infringement occurs.'"  Derek Andrew, 528 F.3d 696, 700-01 (9th
Cir. 2008) (quoting Johnson v. Jones, 149 F.3d 494, 506 (6th
Cir. 1998)) (additional citations omitted); see also Amador v.
McDonald's Corp., 601 F. Supp. 2d 403, 410 (D.P.R. 2009) ("for
purposes of Section 412(2), a continued infringement commences
when the first act in a series of ongoing infringements of the
same kind occurs.") (citations omitted).  So, "a plaintiff may
not recover an award of statutory damages and attorney's fees
for infringements that commenced after registration if the same
defendant commenced an infringement of the same work prior to

registration." Mason v. Montgomery Data, Inc., 967 F.2d 135,
144 (5th Cir. 1992).

Intellitech, recognizing the issue, argues that no
infringement occurred prior to the work's registration, and in
support of that position, makes two arguments.  The first is
easily dispatched.  Plaintiff takes the position that because it
has not alleged in this litigation that IEEE infringed its work
prior to its October, 2014, registration, timing is not a
problem.  That argument is a non-starter for several reasons,
including that plaintiff's position is actually contradicted by
the affirmative allegations in its Complaint; it is inconsistent
with its position earlier in this litigation; and, it is
contradicted by the record evidence.  See, e.g., Compl. ¶¶ 22,
25 (alleging, inter alia, that counsel for IEEE represented to
plaintiff that all copies of plaintiff's work would be removed
from its servers "in response to Plaintiff's letters asserting
its copyright ownership and IEEE's infringement" in October,
2014"); Clark Declaration (Document No. 23-1) at ¶ 12 ("In
October 2014, in response to Plaintiff's prior cease and desist
letter asserting its copyright ownership and IEEE's
infringement, counsel for IEEE expressly represented to
Plaintiff that all copies of Plaintiff's Work would be removed
from its servers . . . I believe that Defendants discontinued

for a significant period of time all activities in Tiger Team 1,
including infringing activities, with regard to the Work."
(emphasis added); Document No. 23-4, p. 3 (September 2, 2014,
letter to Lach from Clark, writing: "Mr. Marinissen conducted
willful infringement."); Document No. 23-4, p. 144 (October 2,
2014, letter to Lach from Clark, writing: "It has come to my
attention that the IEEE is hosting on its servers . . . two
documents, "Modified version of Pipeline clause V20" and "Erik
Jan's review comments on Pipeline clause V20" that contain
Intellitech Corporation copyrighted material. . . . Intellitech
is the author of the material contained within these documents
and the IEEE's use is not authorized and is infringing
Intellitech's copyright.") (emphasis added).

But, notwithstanding plaintiff's self-contradictory
position, the record makes clear that IEEE's 2015-2016 conduct
about which plaintiff complains ("creating, publishing and
displaying a series of infringing derivative works") is
substantially similar to IEEE's 2014 conduct, which plaintiff
now attempts to characterize as merely a "dispute between Mr.
Clark and Erik Jan Marinissen." See Pl.'s Mem. in Supp. of Obj.
to Summary Judgment at 5-6.[7] In both situations, a member of the

_____

[7] Plaintiff's efforts to distinguish between actions taken by
Marinissen and actions taken by IEEE are similarly unavailing.
That is because, first, as defendant points out, plaintiff's

P1838 working group created and distributed a purported derivative of the Clause to the team. So, to the extent plaintiff alleges that IEEE's conduct in December, 2015, through March, 2016, constituted infringement, that conduct similarly would constitute infringement in August, 2014, well before registration of the work in October, 2014.

That, however, brings the court to Intellitech's suggestion that a material issue of disputed fact exists as to whether IEEE's conduct prior to copyright registration constitutes infringement. It argues:

> On this record, a reasonable fact-finder could find that Defendant IEEE did nothing in 2014 beyond that which it impliedly was authorized by Plaintiff Intellitech to do, but that beginning on November 20, 2015[,] IEEE commenced infringing "Plaintiff's Copyrighted Work." (citing Clark Declaration (Document No. 62-1) at ¶¶ 4-5; Def.'s Ans. ¶ 37 (asserting affirmative defense of license).) While it is true that the IEEE's explicit promise conveyed to Intellitech on November 17, 2014[,] eliminated any possible further reliance on the doctrine of license,

---

complaint does not distinguish between defendants, but rather states a single copyright claim against all. And second, the role played by IEEE with respect to the purported infringement in 2014, and in 2015-2016 was functionally the same.

While plaintiff points out that IEEE has denied explicitly authorizing Marinissen's creation of the derivative in 2014, that fact is of limited relevance. At issue in the suit is whether the conduct at issue constituted infringement for which IEEE is liable, not whether IEEE explicitly authorized that conduct (and, the court notes, plaintiff does not contend that IEEE explicitly authorized the 2015-2016 creation of subsequent derivatives).

> (and therefore IEEE cannot reasonably claim that it
> was somehow immunized for the ongoing infringement
> which it committed commencing on November 30, 2015), a
> reasonable factfinder could find that IEEE's conduct
> in 2014 was not wrongful.  Indeed, it is difficult to
> see how a reasonable fact-finder could help but find
> otherwise (non-infringement in 2014 and infringement
> commencing November 30, 2015).

Pl.'s Mem. in Supp. of Obj. to Summary Judgment at 19.

Defendant says its motion is premised, and should be

resolved, on the basis of Intellitech's <u>allegation</u> of

infringement, and any other facts that Intellitech musters to

show that Section 412 is satisfied.  Courts can and do grant

judgment on claims for statutory damages prior to a definitive

finding of copyright infringement.  <u>See</u>, <u>e.g.</u>, <u>IvyMedia Corp. v.</u>

<u>iLIKEBUS, Inc.</u>, 252 F. Supp. 3d 34, 41 (D. Mass. 2017) ("because

the undisputed facts show that the 2015 copyright was registered

after the <u>alleged</u> infringement began, defendants are entitled to

summary judgment on plaintiff's claim for statutory damages and

attorneys' fees as a matter of law.) (emphasis added); <u>see</u> <u>also</u>

<u>Dickert v. N. Coast Family Health, Inc.</u>, No. 14-CV-316-JL, 2015

WL 3988676, at *4 (D.N.H. June 10, 2015) (granting defendant's

motion to dismiss plaintiff's claims for statutory damages,

because plaintiff failed to "register the website until well

after the <u>alleged</u> infringement began, and cannot recover

statutory damages.") (emphasis added); <u>Archer v. Methot</u>, No.

CIV. 09-CV-85-JD, 2009 WL 2929298, at *2 (D.N.H. Sept. 9, 2009)

(ruling, on a motion for judgment on the pleadings, where plaintiff alleged nine instances of infringement occurring prior to copyright registration, "she cannot avoid judgment on the pleadings as to her claim for statutory damages."); but see Aardwolf Indus., LLC v. Abaco Machines USA, Inc., No. CV 16-1968-GW(JEMX), 2016 WL 9275401, at *6 (C.D. Cal. Nov. 21, 2016) (denying defendant's motion for judgment on plaintiff's entitlement to statutory damages where defendant failed to provide evidence of "actual copyright infringement," because "[u]nder the plain meaning of the statute, an award of statutory damages or attorney's fees — and therefore a restriction on such awards under 17 U.S.C. § 412 — is predicated upon a finding of actual infringement prior to registration, not merely allegations of infringement.")

    In this case, however, the date of IEEE's first alleged infringement is plainly disputed, may turn on whether an implied license was given, and whether it was irrevocable.  And, obviously, when infringement, if any, began, is material to determining the availability of statutory damages.  As this court has previously determined, defendant has identified disputed material issues of fact related to its having acquired an implied license to use the work.  Whether that license was revocable also turns on disputed facts.  And, as noted earlier,

IEEE may very well have a joint copyright in the drafting product Clark claims as his own.

All of that matters for purposes of the statutory damages analysis because, assuming IEEE had an implied license, no infringement occurred prior to the October, 2014, registration of the work.  And, if the license was irrevocable, no infringement occurred after the October, 2014, registration either.  However, if IEEE had a license, but the license was revocable, and plaintiff successfully revoked the license in late 2014, no infringement occurred prior to the October, 2014, registration.  Finally, if IEEE holds a joint copyright interest, this case is of course entirely without merit.

That is not to say, of course, that defendant has no other defenses to plaintiff's claim of copyright infringement.  It is only to say, for purposes of the statutory damages analysis, that the potential existence of an implied license and the question of its revocability creates disputed issues of material fact with respect to whether continuing infringement began before plaintiff's October, 2014, registration of the Work.

Accordingly, material issues of fact preclude summary judgment on plaintiff's request for statutory damages and attorney's fees, and the motion is DENIED.

## B.    **Injunctive Relief**

Defendant further argues that Intellitech's claim for injunctive relief is moot, because it turns entirely on the prospect that IEEE will incorporate the Clause (or language from the Clause) into the P1838 standard.  Because IEEE's current "placeholder draft" steers clear of language used in the Clause, and because IEEE has stated it has no intention of using the Clause in the eventual P1838 standard, IEEE argues that the "allegedly wrongful behavior cannot reasonably be expected to recur."  Def.'s Mem. in Supp. of Mot. for Summary Judgment at 19 (quoting Adams v. Bowater Inc., 313 F.3d 611, 613 (1st Cir. 2002)).  In response, plaintiff points out that IEEE has given similar assurances in the past, and its "past assurances are not a good predictor of its future conduct."  Pl.'s Mem. in Opp. to Summary Judgment at 20.

"Where during litigation a defendant ceases to engage in challenged conduct and restores the status quo ante, the lawsuit may or may not be moot."  Adams v. Bowater Inc., 313 F.3d 611, 613 (1st Cir. 2002).  "The Supreme Court has said that such a case is moot only if the defendant meets his 'heavy burden' of persuading the court that it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'"  Id. (quoting Friends of the Earth, Inc. v. Laidlaw

Environmental Servs., 528 U.S. 167, 189 (2000)) (additional
citations omitted).

Defendant's assurance that the conduct will not be repeated
weighs in favor of a finding of mootness.  See Adams, 313 F.3 at
614 (had defendant stated on the record "without hesitation"
that challenged conduct would not reoccur, "this almost
certainly would have persuaded [the court] that the quarrel was
moot.").  However, "as a general rule of thumb, a defendant may
not render a case moot by voluntarily ceasing the activity of
which the plaintiff complains; were the opposite true, a
defendant could immunize itself from suit by altering its
behavior so as to secure a dismissal, and then immediately
reinstate the challenged conduct afterwards."  Brown v. Colegio
de Abogados de P.R., 613 F.3d 44, 49 (1st Cir. 2010).[8]
Intellitech's skepticism in this case is plausible, if only
because IEEE previously represented that its P1838 working group
would not incorporate the Clause into drafts of the developing
P1838 standard.  See, e.g., Document No. 14-5, at p. 3.  Yet,

---

[8]    "The voluntary cessation doctrine does not apply when the
voluntary cessation of the challenged activity occurs because of
reasons unrelated to the litigation."  Am. Civil Liberties Union
of Massachusetts v. U.S. Conference of Catholic Bishops, 705
F.3d 44, 55 (1st Cir. 2013) (quoting M. Redish, Moore's Fed.
Practice, § 101.99[2]) (additional citations omitted).  However,
it is not altogether clear from the record that IEEE's conduct
ceased because of reasons unrelated to the litigation.

Tiger Team 4 later circulated drafts that, as IEEE concedes, "employ[ed] language from the Clause." Def.'s Opp. to Mot. for Summary Judgment at 15. And, while Tiger Team 4's drafts have been incorporated into the overall P1838 draft standard, the P1838 standard has not been finalized. Accordingly, defendant's past actions may be said to "justify a fear of repetition," if weakly. <u>Brown</u>, 613 F.3d at 49.

Whether injunctive relief will be appropriate in this case remains to be seen. On the current record, it does not appear that it will. Too many substantive issues related to the fundamental viability of Intellitech's claims remain to be resolved before any serious consideration of injunctive relief can begin. And it does no harm to IEEE to leave the issue open on the back burner while those substantive matters are addressed and resolved.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, the court concludes that the existence of a genuinely disputed material facts preclude the entry of summary judgment on plaintiff's motion for partial judgment as to liability. Genuinely disputed material facts also preclude entry of summary judgment on defendant's motion for judgment on plaintiff's claims for statutory damages, attorneys' fees and injunctive relief. Accordingly, plaintiff's

motion for partial summary judgment (document no. 60), and defendant's motion for partial summary judgment (document no. 57) are both necessarily **DENIED**.

      **SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

May 23, 2018

cc:  Gary E. Lambert, Esq.
     Stephen B. Mosier, Esq.
     Todd A. Sullivan, Esq.
     Jeffrey C. Spear, Esq.